Michael Wall on behalf of Dr. Nassiri and we thank you for the opportunity of addressing this court today on the issues in this case which are very important especially to Dr. Nassiri. There are two really serious issues in this case that need to be addressed and they're closely related. They're because the one causes the other. There's no expert testimony to establish the amount of the damages in this case and because there's no expert testimony to establish the amount of the damages in this case, the damages are necessarily speculative. Beyond that, there was testimony, oh, sorry, go ahead. There was testimony by a non-scientific expert, so what's, I'm not sure I understand your point. There was, there was expert testimony. Now, whether or not he should be subject to CUMO and those other cases is another matter, but was there not testimony that was very specific with respect to the? There was testimony, Your Honor, and that testimony was rank speculation, that's all that it was. The expert who testified to this, Mr. Patterson, had no experience whatsoever or expertise to do, to testify in the manner that he did. The defense, the Allstate had the burden at trial to prove their damages by some method that is somewhat reasonable. This guy, Patterson, was an Allstate investigator, if I understand correctly, an employee of Allstate. He was a, he was an adjuster for 10 years and then he was in their fraud division for 2 years and that's the only experience that he had. Okay, well, why doesn't that go to the weight of his opinion rather than its admissibility? It, number one, he has to, he has to meet some kind of a standard that he has some kind of expertise other than he is parroting what Allstate has told him to parrot. He says this is based on my experience at Allstate, this is what these cases would have settled for. I mean, I don't know why that wouldn't be admissible and you can argue, well, he's a, whatever he is, he's a lackey, he's a whatever, but, you know, don't give it much weight. The formula that he applied is just a sophomoric effort to have an Allstate put up a spokesperson to say, this is what our damages are. But wait a minute, sophomoric or not, what Allstate is saying is when we find what the medicals are, we have our formula as to what the case is worth. We project forward from medicals. I don't say that that's the only way to do it. When I was doing it, I take medicals and wage loss and whether there was a residual injury, and then maybe I'd apply a factor, right? So I might have had a wonderful time cross-examining Mr. Patterson, but Patterson says Allstate took medicals, the formula, and that's what the case is worth. That's not what they did. That's not what Patterson said they did when they decided what a settlement was. That's what Patterson said they did when they decided after a settlement was over and when they were suing Dr. Nassiri to determine what their damages are, which is a completely different question. We've had a lot of... I've testified, this is what the case was worth based on Allstate's practice. I know Allstate's practice. We take the medicals, we apply the formula, and that's what the case is worth. And if the case sums above that, it's because the medicals have been puffed up, period, end of story, cross-examined. With all due respect, that's not exactly what happened at all. He testified that there were thousands of things that they would have taken into consideration the first time around, but the second time around, he's just applying a formula. I gave very specific examples in my brief of how absurd the application of this formula was, and the response that I got was very generic. Damages don't have to be specific and they can be estimated. I agree with that. The problem is, it's one thing if you have a jury who is given some testimony about, this is how you should evaluate these things, and then they come up with a number which may or may not be specific because of the circumstances. It's a completely different thing to put a person on the stand who has no expertise and have him say, here are some numbers. For example, 50 of the cases were decided based on, these were policy limits cases. In policy limits cases, they're decided for the policy limits cases quickly for a seriousness of the accident. Here, we take a policy limit case that settles for $20,000, not because the case is only worth $20,000, but because that's the policy limit, and Mr. Patterson takes that case, and in 50 of these cases, he arbitrarily says, we should have settled this. He didn't even apply a formula here. He just arbitrarily says, I've looked at the case, and I think it would have settled for $7,900. The plaintiff in that case would not have settled for $7,900. They would have forced that case to trial, and they would have had to expend the money to go to trial, and so their damages, you can't simply say they have, therefore, they have $15,000 in damages. If you make the search, I'm sorry, I was going to ask a second question. Roberts, we argue that to the jury. It's the problem with saying that's an argument for the jury is that the jury is given this, what looks like a spreadsheet, which is nothing more than Dr. Little looked at these things and said some of these cases should have been 500, some of them should have been 600, and some of them should have been 900, and he pigeonholed them. And then Mr. Patterson took those cases, and he grossed them up or pushed them down depending on what the lawyers told him to do, and we have no idea what those numbers are at all, and then he took some of them and he guessed, and the others he applied this sophomoric formula to. There couldn't be anything that would be more rank speculation. Kennedy, when you asked Mr. Patterson when he was on the stand, did you ask him, are you doing this by instruction from the lawyers? Yes, and he denied it. Oh, that's mad. But the record demonstrates the opposite. That's why I went painstakingly through the way that they developed this spreadsheet. The spreadsheet that was presented to the jury was never seen until trial. It wasn't seen before trial, and it was first the lawyers made what was specifically a guess, $600,000, then it was up to $1.4 million, and it was higher than that, and then at trial they came in with a completely different spreadsheet, and this spreadsheet is $1.2 million. The jury doesn't know what to do with that, but it's all they have. It's not junk science. It's just junk testimony. They could have put on an expert who could have addressed the factors that go into deciding how to settle a case. They could have put on an expert who could have said, you know, one of the things is how much it is, and here's some evidence that we have of what we think or what the numbers were, and some credible evidence of some sort as to what the numbers should have been, what Dr. Little did to pigeonhole all of these cases under $1,000 is absurd on its face. They certainly, if damages are completely speculative, they can't be upheld. They could have put on that kind of evidence, and they could have left it to the jury after they put on an expert to explain how they go about this process to come up with a number that might have been a damages number, but that's not what they did. Mr. Patterson? Do you want to address statute of limitations, because you've got only two minutes? Yeah. May I? I'm sorry. The statute of limitations issue. Oh, the statute of limitations argument. I'm sorry, Your Honor. I didn't hear you. On the statute of limitations argument, I believe that there is plenty of evidence in this record to show that they knew long before they brought this action, years before they brought this action, they say out of one side of their face that it's patent on the documents themselves that Dr. Desiree is billing too much and is grossing up the meds, and out of the other side they say, but we couldn't have known from that, that there was fraud. The judge allowed you to try the statute of limitations defense to the jury, too, didn't he? He did, Your Honor. And you lost in front of the jury on that. And we did, Your Honor. And whether you look at it as the district judge should have been, and I'm sorry, you should never have allowed this as a matter of law to go to the jury, or you look at it and say the jury didn't buy the statute of limitations defense, the result is the same. The problem is there is evidence. Scalia, Mr. Wall, in your brief you don't talk about the evidence at the trial. In your brief what you talk about are the affidavits and the other evidence that was submitted on the motion of summary judgment. Do you see a little problem there? I did mention in the – I understand that. But where – but since you don't argue what evidence is in the record which constitutes clear error if statute of limitations is not accepted, we're in a quandary as to what you mean. There's no evidence in the record except for the evidence which I pointed out in my brief, which is that these witnesses – Where did you point out any evidence of prior knowledge of all State outside the statute of limitations at a time when, with due diligence, they should have started the running of the statute of limitations? Tell me where you did that. I can't create a record that doesn't exist, Your Honor, and you're right about that. What I can say is that the evidence that was presented was simply the witnesses saying, well, we couldn't have known there was fraud because we looked at this, and even though it's all wrong, we can't figure out that it's fraud. So they were able to take this and continue it for years and years and years. 156 out of 5,400 cases in order to show a pattern. That's what they did. Thank you. Thank you, counsel. The time for your side has expired. We'll hear from the company. Good morning, Your Honors. Todd Baxter, if it may please the Court, on behalf of Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Indemnity Company. Your Honors, this is a case of egregious fraud. Basically, that was admitted to by Dr. Nassiri on the stand. All the claims that Allstate was making against Dr. Nassiri, he acknowledged those. Liability is not an issue here. The only issue is damages. Do the speculation on the damages, Your Honor. When you're talking about the damages in this particular case, they're arguing that numbers were thrown about by Dr. Little, that he pulled them out of a hat. If you look at his report, you look at his testimony and his analysis, he went through and figured out what the total chiropractic expenses were, and then based on his experience, what the reasonable chiropractic expense was. That information was provided to Mr. Patterson. Now, when you look at what Dr. Little testified to, Dr. Little went through  based on his experience. That is uncontroverted. They didn't present any witness whatsoever, expert witness, to controvert anything that he had said. Is my impression wrong that the only thing that Mr. Patterson used to evaluate the value of the claim for settlement purposes are the medical specials? No, not just the medical specials. What did he use besides that? Well, when it came to he did use the medical specials and an evaluation of when using their formula, and it's basically algebra, when using the formula, he took the, for the total, the reasonable and legal expenses today, he evaluated not just the medical specials that were provided by Dr. Little, but he looked at whether there was emergency room visits, any doctors prior to that, that got included into the number because we weren't analyzing that, to the extent there was a necessary referral, those medical expenses were included in as well. So if you look at, for example, like the first one on the list, Dr. Little had come to the conclusion that there was, I believe, $695 from advance accident in reasonable medical expenses, if you're looking at Exhibit 376. From our end, Mr. Patterson found $1,459 to be the reasonable medical expenses. What he did is he included those outside expenses when he looked through the file. He looked at all the medical expenses, ER expenses and other expenses? Sure. Right? Right. Medical specials. What else did he use to get to the reasonable value? Did he use a multiplier? He did use the multiplier for non-policy limit claims. Times 2 or times 3, times 4? What did he get? What he did is he took the total amount of expenses allowed, and then you look at the amount of the settlement that was paid. Within that is, I guess, the percentage of pain and suffering. It was an equalization. That's what the formula did. So when you multiply it out based on the formula that they used, you had, for example, for the first one, the total allowed expenses at the time of settlement amounted to 63 percent of the settlement amount that was paid by Allstate. When you work yourself through the formula that he used, the $1,459 of reasonable and legal expenses today, the formula simply equalizes that. It says that number is 63 percent of what? When you use the mathematics, it comes out to $2,139.82. It's the same percentage. We know what the case, what the allowed medical expense is for. We know what the case is. Cut to the chase. What he said was when a 63 percent, when a medical is 63 percent of the settlement value, medical is too high, right? Well, I don't think he was looking at it that way. He was looking at whether the chiropractic expenses were too high. Okay. Then he recalculated that number. It should be 30 percent. Is that what he said? Well, he didn't necessarily do that. Not in nonpolicy limit cases. For policy limit cases, Your Honor, what he did is he did go back, because they are He tried to determine what was the highest ratio of pain and suffering that would go into it. Certainly, we had the medical expenses. We knew the reasonable and legal expenses, and we knew what was allowed medical expenses. And he also added property damage? I don't think he looked at the property damage. I don't know. That was settled separately, but I think for the most part. But you just mentioned that a moment ago. Right. But he looked at the property damage, and from his assessment and his expertise, he looked at it from the perspective that that gives him a better gauge of what the pain and suffering might have been in this particular case. And so what he was looking for on the policy limit cases, because they are a little bit more difficult, because they are policy limit cases, is to determine does this formula that we're using, does it accurately reflect what the ultimate amount should be of what Allstate paid? And he looks at the higher end of what pain and suffering would be, and that's why they used that 90-day fast-track form. That's what he was talking about. The 90-day fast-track form was for policy limits cases. They weren't for the non-policy limits cases, because you can do the mathematics on that and determine your percentages for purposes of pain and suffering. Because you know how much you paid, you know what the plaintiff's lawyer took in terms of settlement, and you applied your mathematical formula to create the most reasonable and reliable method of calculating damages. Let me ask you about the statute of limitations, if I may, Mr. Baxter. Do I understand that it's uncontroverted that Allstate became suspicious of this guy back in 2002, 2003? No, it's not uncontroverted. Didn't start an investigation back then? They did not. What happens When did the investigation begin? The investigation began in 2006, as I recall, from the testimony at trial from Mr. Patterson. They weren't on to this guy? He got involved. That's when the investigation started. They weren't on to this guy in 2002, 2003? No. Well, you know, they're looking at all doctors, and that's what the testimony as part of the motion for summary judgment said. When you're they're looking at various doctors, all the claims representatives do. Sometimes they send them on to SIU. Sometimes SIU looks at the particular claim. They'll say pay it, because they can't find anything. And they're certainly not finding a pattern at that time, because the advanced accident opened in 2001. Then you didn't have digital imaging, I think, opened in 2004, and Maryland Medical opened in 2005. And it wasn't really until this larger pattern was developing, that's when they started looking at it in 2006. I got you. That's what the testimony was at trial. That's uncontroverted at trial. Right. When you get to the issue of the motion for summary judgment, certainly when you had an opportunity to present your entire case at trial, present all your evidence, make your arguments. Well, the trial supersedes the argument. It supersedes anything that happens in the motion for summary judgment. And their argument in this instance was forget about what happened at trial, let's go back to 2011 when we brought the motion for summary judgment, and the Court should look at that and the evidence at that time. That's just a snapshot of evidence. And the Court at that time properly found there's tribal issues and material factors of when State Farm knew about it and when or all State knew about it and when they started investigating. So that aspect of it, I thought, it goes really to the way that the evidence, the jury made that determination. They were asked specifically by Dr. Nassiri and the other defendants to start with the question of whether the statute of limitations applied. The jury answered it didn't. And that's based on the testimony at trial. That's substantial evidence that supports that aspect of the verdict. If the Court has any other questions, I'd be happy to answer them on the damages and the tort. Roberts. No further questions. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'scannlain, Silverman, Bea